IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RAMON CLARK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 21-cv-1695-RJD |
| | ) |
| WEXFORD HEALTH SOURCES, INC. | ) |
| and DAVID POOR, M.D., | ) |
| | ) |
| Defendants. | ) |

**ORDER**

**DALY, Magistrate Judge:**

Plaintiff, formerly incarcerated within the Illinois Department of Corrections ("IDOC"), filed this lawsuit pursuant to 42 U.S.C. §1983 pro se and in forma pauperis. He alleges that from August 2020-December 2021 at Robinson Correctional Center, Dr. David Poor was deliberately indifferent to his chronic cough. Doc. 1. Plaintiff further alleges that Wexford Health Sources, Inc. ("Wexford," a private company that contracts with IDOC to provide medical care to inmates within the IDOC) delayed off-site treatment for his cough. Plaintiff's Complaint contains Eighth Amendment claims against Dr. Poor and Wexford for their alleged deliberate indifference to Plaintiff's serious medical needs. *Id.* This matter comes before the Court on Defendants' Motion for Summary Judgment. Docs. 30-32. Plaintiff did not file a Response. As explained further, Defendants' Motion is GRANTED.

**Material Facts**

Plaintiff received treatment for his "dry" cough from nurses and Dr. Vipin Shah at Robinson Correctional Center from April 2020-August 2020. Doc. 31-3, ¶¶5-22. During that

time, Plaintiff received the following medications at various times: 1) Coldonyl, an oral medication to treat symptoms of the common cold; (2) Claritin; (3) Guaifenesin; (4) chlorpheniramine maleate (an antihistamine); (5) Augmentin (antibiotic); (6) and Nasocort (nasal spray).  *Id.,* ¶¶5, 6, 7, 10, 13, and 14.  On June 16, 2020, Plaintiff underwent a chest x-ray; the radiologist reported an "indeterminate 5 mm pulmonary nodule within the left lung."  Doc. 31-4, p. 150.  On July 23, 2020, Plaintiff underwent a chest CT scan.  *Id.,* pp. 106-07.   The report from the radiologist stated that Plaintiff had a "history of pulmonary nodules; chronic dry cough for fourth months" and "no acute CT abnormality of the chest. Previous granulomatous process with calcified granulomata in the left lower lobe and left upper back."  *Id.*, p. 106.  Plaintiff also underwent a CT scan of his sinus area; the radiologist noted that he had a "solitary mucous retention cyst or polyp associated with the right posteromedial maxillary sinus."  *Id.*, p. 114-15.

Dr. Poor saw Plaintiff on August 11, 2020.  Doc. 31-4, p. 38.  Dr. Poor noted that Plaintiff was "waiting for his ENT appointment"[1] and that his chest CT and x-ray imaging reports were normal.  Doc. 31-3*,* ¶23.  Dr. Poor stated in his declaration that "Plaintiff self-reported that he had an asthma-type inhaler in the past and that he could not remember if it helped, but the cough went away."  *Id*.  Dr. Poor conducted a physical exam and noted that Plaintiff's lungs were clear.  *Id*.  In his Declaration, Dr. Poor provided the following explanation for his plan for Plaintiff's care:

> My plan was to hold his ENT referral for now for a trial of albuterol inhaler. If the inhaler was helpful, I noted to consider spirometry.  I prescribed Xopenex for six months and to follow-up in two weeks to see if it was helpful and if not then discontinue and pursue ENT referral.  As Plaintiff self-reported that his cough went away in the past with an asthma-type inhaler, I wanted to start with a trial of an inhaler prior to the ENT referral.  In my experience, the ENT would request a similar medication trial of the asthma inhaler, so I wanted

---

[1] Defendants' motion does not explain whether Plaintiff was referred for an ENT appointment prior to his first visit with Dr. Poor.

    to see if that was beneficial for Plaintiff prior to sending him to the
    ENT.

*Id*.  Dr. Poor saw Plaintiff again on August 27, 2020 for a keloid on his face, chronic cough, and a pre-operation history for a testicular procedure. *Id.,* ¶24. Plaintiff reported that the albuterol inhaler "helped [his cough] some." *Id.* Because the inhaler was "somewhat effective," Dr. Poor "placed a referral" to Wexford for Plaintiff to undergo a spirometry test. *Id.*

  Dr. Poor reviewed Plaintiff's chart on September 11, 2020 after Plaintiff reported to a nurse that he had not "heard what my head and chest CT showed." Doc. 31-4, p. 40. Dr. Poor noted that spirometry was previously ordered and "please re-order after COVID lockdown is over, if not already done."[2] *Id.* He further noted that if the spirometry test indicated that Plaintiff has asthma, the healthcare unit at the prison could treat his asthma. Doc. 31-3*,* ¶25. However, if the spirometry test was negative for asthma, Dr. Poor "would consider restarting the ENT referral." *Id.*

  Dr. Poor saw Plaintiff on October 5, 2020 for the chronic cough. Doc. 31-4, p. 40. Plaintiff reported that he was not better with the "trial of Xopenex" and that heartburn medications, Nasacort, and antibiotics were not helpful. Doc. 31-3*,* ¶28. Dr. Poor discontinued the Xopenex and "placed referrals" for Wexford to approve Plaintiff to see an ENT and undergo spirometry. *Id.*

  Wexford approved the spirometry and ENT referrals on October 12, 2020. Doc. 31-4, p. 117-18. On or around that date, Plaintiff tested positive for COVID. Doc. 31-4, p. 48. On November 23, 2020, a staff member in the health care unit scheduled Plaintiff for an offsite ENT consultation. *Id.*, p. 58; Doc. 31-3*,* ¶34. Plaintiff saw Dr. Charly Nguyen (ENT) on December

---

[2] It is not clear from Defendants' Motion when the COVID lockdown started or ended, or if there were multiple COVID lockdowns during the relevant time period.

9, 2020. Doc. 31-5, pp. 20-22; Doc. 31-3, ¶36. Dr. Nguyen recommended a "pulmonology evaluation due to abnormal CT scan with granuloma" and noted that Plaintiff had a "benign skin lesion" on his right cheek. Doc. 31-5, p. 21. Dr. Nguyen noted that he "explained to patient if this lesion [is] getting larger or causing discomfort or if he has any question concern then he needs to talk to his prisoner doctor about coming back to see me." *Id.*

Plaintiff saw Dr. Poor on December 21, 2020. Doc. 31-3, ¶38. Dr. Poor referred Plaintiff for consultations with a pulmonologist and dermatologist. *Id*. Wexford approved those referrals two days later. Doc. 31-5, pp. 190-91.

On February 23, 2021, a staff member scheduled Plaintiff's pulmonology consultation and offsite spirometry/pulmonary function test[s]. Doc. 31-4, p. 64. Dr. Poor explained in his affidavit that "[d]uring this time, there were many delays both inside and outside the prison for scheduling offsite appointments due to the COVID-19 pandemic. Many private doctors' offices refused to see patients residing in group-living situations such as prisons or nursing homes." Doc. 31-3, ¶40.

Plaintiff saw Dr. Vishesh Paul (pulmonologist) on February 25, 2021. Doc. 31-5, p. 25. Dr. Paul noted that Plaintiff "[h]ad CT chest-as per the note from the physician at the correctional facility there were no acute findings." *Id.* Dr. Paul noted "no clear etiology of chronic cough established…will get PFTs pre and post bronchodilator spirometry…recommend CBC with differential to look at eosinophil counts…will also get IgE levels…Flonase for 2 more months….low dose PPI for 2 months trial." *Id*., p. 26. On that same date, and after reviewing Dr. Paul's note, Dr. Poor prescribed Flonase and Prilosec (a "PPI") for two months. Doc. 31-3, ¶42. He also ordered the recommended blood tests and noted that Plaintiff's spirometry testing was already scheduled. *Id*.

Plaintiff underwent the spirometry testing on March 2, 2021. *Id.*, ¶44. The results were within normal limits. Doc. 31-5, p. 203. Dr. Poor saw Plaintiff on March 10, 2021 and noted that the pulmonary functioning test results were normal and that Plaintiff was still taking Prilosec and using Flonase. Doc. 31-3, ¶46.

Dr. Poor saw Plaintiff on March 23, 2021, following Plaintiff's consultation with the dermatologist. *Id.*, ¶47. Following the dermatologist's recommendations, Dr. Poor ordered Prednisone and a corticosteroid. *Id.* Plaintiff returned to Dr. Poor on April 16, 2021, reporting that his cough was getting worse and he had new skin spots. *Id.*, ¶48. Dr. Poor instructed Plaintiff to keep using the corticosteroid ointment and made a referral for Plaintiff to return to Dr. Paul (the pulmonologist). *Id.*; Doc. 31-4, p. 70. Three days later, Wexford approved the pulmonology referral. Doc. 31-5, p. 45. Dr. Poor saw Plaintiff again on May 11, 2021 to follow-up on his skin condition; Dr. Poor referred Plaintiff back to the dermatologist (per the dermatologist's instructions) and Wexford approved the referral six days later. Doc. 31-3, ¶50; Doc. 31-5, p. 213.

Plaintiff returned to the pulmonologist on June 24, 2021. Doc. 31-3, ¶52. Dr. Paul completed a form titled "IDOC Medical Special Services Referral and Report", noting that Plaintiff's "intermittent coughing persists" but his pulmonary functioning testing was within normal limits. Doc. 31-5, p. 47. Dr. Paul recommended a trial of "BRPO Ellipta" (inhaler with powdered medication) for two months, Mucinex, and "consider CT chest" if Plaintiff was not improved in 2-3 months. *Id*. Doc. 31-3, ¶52. The next day, Plaintiff returned to the dermatologist who diagnosed him with dermatitis and recommended to continue the corticosteroid ointment and alternate with Protopic (another ointment). Doc. 31-5, p. 62. The dermatologist also recommended a tapering dose of Prednisone. *Id.*

On June 28, 2021, Dr. Poor reviewed the recommendations from the dermatologist and pulmonologist. Doc. 31-3, ¶54. He also saw Plaintiff and ordered Airduo (similar to BRPO Ellipta) for three months. *Id*. Dr. Poor "noted to request the notes" from Dr. Paul; it appears that only the form titled "IDOC Medical Special Services Referral and Report" returned to the prison with Plaintiff after his June 24, 2021 visit with Dr. Paul. *Id*., ¶¶52, 54, 55. Dr. Poor also "requested blood work." *Id*., ¶54. Plaintiff did not want to take the Prednisone prescribed by the dermatologist. *Id*.

On or around August 13, 2021, a nurse noted in Plaintiff's medical records that Plaintiff told the warden that he needed to see a lung specialist. *Id*., ¶56; Doc. 31-4, p. 87. On August 19, 2021, Dr. Poor performed a chart review after Plaintiff appeared on nurse sick call, complaining that his cough had not improved with the inhaler. Doc. 31-3, ¶57. Dr. Poor prescribed Mucinex and scheduled a one-month follow-up visit. *Id*. Dr. Poor saw Plaintiff on September 13, 2021. *Id*., ¶60. Plaintiff reported that the inhalers and Mucinex did not alleviate his cough. *Id*. Dr. Poor "referred Plaintiff back to the pulmonologist and noted that he had already received a chest CT on July 22, 2020 which was normal." *Id*. The pulmonology referral was approved on September 20, 2021. *Id*., ¶61.

Plaintiff returned to see Dr. Paul on November 11, 2021. Doc. 31-5, pp. 75-77. Dr. Paul made the following notes and recommendations:

> Here for follow-up chronic cough. Has been going on for more than a year. Happens for some days and then he is fine for some other days. The cough is dry most of the time. Occasionally coughs up clear phlegm….he had CT chest in April 2020[3]-as per the note from the physician at the correctional facility, there were no acute findings on the CT chest…..as per the patient ENT evaluation did not reveal any acute problem.
>
> Labs and imaging reviewed.

---

[3] The Court presumes that Dr. Paul was referring to the July 2020 CT exam.

> Unclear etiology for his chronic cough at this time. PFTs/CT chest reports have been within normal limits. Has not improved with AirDuo, albuterol inhaler, Flonase-unlikely to be asthma. There is no wheezing either. Can discontinue the inhalers at this time as there has been no benefit. Have asked the 3 [sic] correctional facility to send us the ENT reports. Maybe we need another evaluation by ENT team to look at the larynx and the sinuses. May also need GI evaluation. If all testing is within normal limits-will consider bronchoscopy.
>
> Follow-up in 3-4 months.

*Id*.

When asked about his November 11, 2021 visit with Dr. Paul, Plaintiff provided the following testimony at his deposition:

> [Dr. Poor] had a dialogue between he and Dr. Paul about [Dr. Poor] not sending updated tests and stuff that he was supposed to send for Dr. Paul to evaluate, because Dr. Paul said that he would have his staff personally…assure him that they would send the tests that [Dr. Paul] needed to properly evaluate me.
>
> So that's why you see Dr. Poor ordering, saying that we need to send this, we need to order this bloodwork, we need to send this and that, because I remember having that conversation with Dr. Paul. Like two or three visits he kept saying "Where is your work at? What am I supposed to do with this outdated stuff." He kept saying that.
>
> And the last time I seen him, he was so frustrated. And I'm like, "Man, you keep telling me that you [are] going to have them send it, you need to call." He said, Don't worry about it, Mr. Clark, I'll get on top of it."

Doc. 31-1, pp. 107-08. Regarding the bronchoscopy, Plaintiff testified that Dr. Paul said "'we need to get aggressive with this testing because none of this stuff is working. We're dealing with something serious here now. We need to get more aggressive with your test. I'm going to order a bronchoscopy.'" *Id*., pp. 110-11. Plaintiff testified that Dr. Paul also consistently told him there was a relationship between his cough and skin rash. *Id*., p. 122.

Dr. Poor noted that he saw Plaintiff at 12:05 p.m. on November 15, 2021.  Doc. 31-4, p. 97.  Plaintiff self-reported that Dr. Paul recommended a bronchoscopy.  *Id*.; Doc. 31-3, ¶63.  Dr. Poor made a "referral back to pulmonology for bronchoscopy and noted to send Plaintiff's IgE labs and CBC reports to Dr. Paul."  *Id*.  Dr. Poor also noted to "request pulmonology office note from 11-11-21" and "request ENT office note from 12-9-2020."  *Id*.  Dr. Poor received these records within three hours and directed the nursing staff to fax the 12-9-2020 ENT note to Dr. Paul.  Doc. 31-3, ¶65; Doc. 31-4, p. 99.

Plaintiff saw the dermatologist on November 17, 2021.  Doc. 31-3, ¶66.  The dermatologist recommended Dupixent.  *Id*.  Upon his return to the prison, Dr. Poor ordered blood tests for him.  *Id*.;  Doc. 31-4, p. 101.  Plaintiff's bronchoscopy referral was approved by Wexford on November 19, 2021.  Doc. 31-5, p. 117.  A member of the medical staff called Dr. Paul's office to schedule the bronchoscopy on December 8, 2021 and was informed that the procedure was not currently indicated.  Doc. 31-4, p. 103.  The next day, Dr. Poor reviewed Plaintiff's records and saw that Dr. Paul had stated "'may have to consider bronchoscopy' in the future, but not yet indicated" and cancelled the bronchoscopy referral.  *Id.*; Doc. 31-3, ¶70.

Plaintiff transferred to a work release center on December 30, 2021.  Doc. 31-2, pp. 10, 114.  He believes that he would have been transferred to the center earlier than December 30, 2021, but his transfer was denied or postponed so that he could undergo the bronchoscopy.  *Id*., p. 111.  A nurse told him "you've been complaining all these years about your cough.  Now we [are] getting you out for a bronchoscopy.  So go get the bronchoscopy.  Your health is more important than a transfer."  *Id*., pp. 112-13.  Regarding Dr. Poor's ultimate decision to cancel the bronchoscopy, a nurse (it is unclear whether it was the same/different nurse) told Plaintiff "Dr. Poor and them didn't want to pay for it, because [Plaintiff] was being transferred."  *Id*., p. 112.

At the time of his deposition, Plaintiff was still on parole. Doc. 31-2, p. 120. Since leaving Robinson, he has undergone a bronchoscopy and seen gastrointestinal, pulmonology, rheumatology, and dermatology specialists. *Id.*, p. 119. Plaintiff testified that none of the specialists have "officially diagnosed" his chronic cough, but they have "consistently said" that he has sarcosis or sarcoidosis and that there is a relationship between his cough and skin rash. *Id.*, p. 122. From these specialists, Plaintiff has received "basic trial medications" that are not effective, the same inhalers that he used at Robinson that are also not effective, and "some type of little pills" that were also not effective. *Id.*, p. 123.

## Summary Judgment Standard

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248). In considering a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

**Discussion**

The Eighth Amendment "'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Brown v. Osmundson*, 38 F. 4th 545, 559-60 (7th Cir. 2022) (internal citations omitted). To succeed on his deliberate indifference claims, Plaintiff must "provide evidence, either direct or circumstantial" that shows (1) "he had an objectively serious medical need" (2) "which [Dr. Poor] "[knew] of and disregar[ded] a substantial risk of harm." *Id*. at 550. Dr. Poor does not contest that Plaintiff's cough was an "objectively serious medical need," but contends that a reasonable jury could not find Dr. Poor disregarded a substantial risk of harm to Plaintiff. The Court considers the "totality" of Plaintiff's care for his cough to determine whether a genuine issue of material fact exists regarding Dr. Poor's alleged deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Far from a genuine issue of material fact, nothing before the Court even hints at deliberate indifference. Instead, the record reflects that Dr. Poor provided a prompt, reasoned response every time Plaintiff's cough and symptoms were presented to him.

In his Complaint, Plaintiff alleged that during the sixteen months Dr. Poor treated him, Dr. Poor "did not timely refer Plaintiff off-site for proper evaluation." The evidence before the Court contradicts this argument. From August 2020-December 2021, Dr. Poor referred Plaintiff to see a pulmonologist three times. He also referred Plaintiff to an ENT, for spirometry testing, and for a bronchoscopy. In fact, he was too quick to make the bronchoscopy referral; the pulmonologist informed him that it was not yet indicated in December 2021. To the extent that there were scheduling delays, nothing in the record indicates that Dr. Poor or any other staff member could have arranged those appointments any sooner. Even if Dr. Poor or another staff member could have arranged Plaintiff's appointments sooner (considering the Covid pandemic), a delay in

treatment is actionable under the Eighth Amendment only if the evidence reflects that "the delay exacerbated the [condition] or unnecessarily prolonged pain." *Id*. at 730-31. There is no evidence from which the jury could infer that Plaintiff's cough would have subsided had the spirometry testing or consultations with the ENT and pulmonologist occurred sooner.

The Court acknowledges that after seeing Plaintiff for the first time in August 2020, Dr. Poor deferred Plaintiff's ENT referral so that Plaintiff could try an inhaler. However, Dr. Poor's explanation for this delay-his belief that the ENT would want to know whether Plaintiff's cough was alleviated by an inhaler before recommending any further treatment-is reasonable and uncontradicted.

Plaintiff also alleges that Dr. Poor persisted in a course of treatment known to be ineffective. *See Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). Of all the treatment that Dr. Poor provided Plaintiff, no evidence indicates that Dr. Poor knew it was ineffective. In fact, most of the medications Dr. Poor prescribed to Plaintiff were recommended by the ENT or pulmonologist.

In his Complaint, Plaintiff claimed that Dr. Poor "lift[ed] the medical hold" so that Plaintiff would be transferred to the work release center without undergoing the bronchoscopy. The only evidence in the record that could possibly support this argument is Plaintiff's testimony that a nurse said "Dr. Poor and them" did not want to pay for the bronchoscopy. Evidence that is barred by the rule against hearsay does not defeat summary judgment. Fed. R. Civ. P. 56(c)(2); *Eisenstadt v. Centel Corp*., 113 F.3d 738, 742 (7th Cir. 1997). Regardless, even if Plaintiff's testimony of the nurse's statement was not barred by the hearsay rule, and even if other evidence showed that Dr. Poor and Wexford did *not* want to incur the cost of bronchoscopy, the record is devoid of evidence from which the jury could infer that Dr. Poor played any role in the timing of

Plaintiff's transfer to a work release center. Dr. Poor referred Plaintiff for a bronchoscopy based upon Plaintiff's statement that the pulmonologist thought it was necessary, only to find out that the pulmonologist did not think the procedure was indicated at that time.

Throughout his deposition, Plaintiff referred to statements by the pulmonologist that he (the pulmonologist) was frustrated because he could not determine the cause of Plaintiff's cough without recent blood tests. Even if that testimony by Plaintiff was not barred by the hearsay rule, only one record indicates that the pulmonologist informed Dr. Poor that additional bloodwork was necessary. When Plaintiff saw the pulmonologist in February 2021, the pulmonologist recommended two blood tests. When Plaintiff returned to the prison that same day, Dr. Poor ordered those blood tests. The record is silent as to when those tests were performed. Dr. Poor requested Plaintiff's blood work again in June 2021. When Dr. Poor saw Plaintiff on November 15, 2021 (the same date that Plaintiff told Dr. Poor he needed a bronchoscopy and Dr. Poor immediately made a referral for the procedure), Dr. Poor ordered staff to fax the blood test results to the pulmonologist. No evidence exists to suggest that a delay in performing the blood work-or the delay in getting the blood work to the pulmonologist-could be attributed to any action or inaction by Dr. Poor. Even if there was a delay, and even if it was attributed to Dr. Poor, no evidence suggests that Plaintiff's cough would have been alleviated to any extent if the pulmonologist had seen Plaintiff's bloodwork sooner. After leaving the prison and being paroled, Plaintiff underwent a bronchoscopy and received various medications, and yet he still has a persistent cough.

The Court also notes that when Plaintiff saw the ENT specialist in December 2020, he recommended that Plaintiff undergo a "pulmonology evaluation due to abnormal CT scan with granuloma." It does not appear this issue was ever brought to the attention of Dr. Paul (Plaintiff's

pulmonologist).   Dr. Paul repeatedly noted that "per the note from the physician at the correctional facility there were no acute findings" in Plaintiff's July 2020 CT scan.  In any event, nothing in the record reflects that Plaintiff suffered from an undiagnosed or untreated condition that was reflected in the July 2020 CT scan and even if it was, nothing in the record reflects that Dr. Poor conveyed (or failed to convey) information to Dr. Paul in a deliberately indifferent manner.  At most, a jury could infer that Dr. Poor failed to notice and inform Dr. Paul that the ENT specialist thought the granuloma visible in Plaintiff's April 2020 CT scan was an acute abnormality. Considering the radiologist who reviewed the images noted no acute abnormality, any purported failure by Dr. Poor to identify and convey the ENT specialist's opinion to Dr. Paul falls far afield of the standards for an Eighth Amendment violation.  Moreover, when Dr. Paul requested the ENT specialist's records, Dr. Poor instructed the nursing staff to obtain and send those records to Dr. Paul.

   Overall, no reasonable juror could find that Dr. Poor was deliberately indifferent to Plaintiff's serious medical needs.   Summary judgment is appropriate in favor of Dr. Poor. Summary judgment should also be granted in favor of Wexford unless the record reflects a genuine issue of material fact regarding whether Plaintiff's Eighth Amendment rights were violated by 1) Wexford's express policy; 2) Wexford's "widespread and persistent practice that amounted to a custom approaching the force of law"; or 3) a Wexford "official with final policymaking authority."  *Howell v. Wexford Health Sources, Inc*., 987 F.3d 647, 653 (7th Cir. 2021) (internal citations omitted).  As explained above, none of the evidence reflects that Dr. Poor violated Plaintiff's Eighth Amendment rights.  Wexford approved each referral made by Dr. Poor for Plaintiff's off-site treatment.  Moreover, no evidence indicates that any of the issues Plaintiff alleged in his Complaint-the delays in receiving offsite treatment, his transfer to the work release

center before he underwent a bronchoscopy-had any connection to a Wexford policy, practice, or official with final policymaking authority. Consequently, Plaintiff's claim against Wexford contains no genuine issue of material fact.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 30) is GRANTED. Plaintiff's claims against Defendants are DISMISSED WITH PREJUDICE. The Clerk of Court is directed to enter judgment accordingly. All settings are VACATED and Defendants' pending Motion to Continue (Doc. 33) is DENIED AS MOOT.

**IT IS SO ORDERED.**

**DATED: November 19, 2024**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**